**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **LISA BETH ACKERMAN,** | : | |
| | : | |
| Plaintiff, | : | **OPINION & ORDER** |
| - against - | : | |
| | : | **13-CV-6675 (RLE)** |
| **CAROLYN W. COLVIN,** | : | |
| **Acting Commissioner of Social Security,** | : | |
| | : | |
| Defendant. | : | |

# I.   INTRODUCTION

Plaintiff Lisa Ackerman ("Ackerman") commenced this action under the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") that her claim for disability benefits be denied. On July 14, 2014, Ackerman filed a motion for judgment on the pleadings, asking the Court to remand the case for a supplemental administrative hearing or, in the alternative, reverse the decision in its entirety and direct the Commissioner to pay benefits to Ackerman as of the application date of August 31, 2010. On September 15, 2014, the Commissioner filed a cross-motion for judgment on the pleadings, asking the Court to affirm the Commissioner's decision. For the following reasons, I order that Ackerman's motion be **GRANTED** and the case be **REMANDED** for further administrative proceedings. (Doc. No. 13)

# II.   BACKGROUND

## A. Procedural History

Ackerman applied for child's disability insurance benefits on August 18, 2010. (Transcript of Administrative Proceedings ("Tr.") at 12.) The Social Security Administration

("SSA") denied her claim on December 2, 2010, and on January 21, 2011, Ackerman requested a

hearing before an Administrative Law Judge ("ALJ"). (*Id.*) Ackerman appeared before ALJ

Mark Hecht on October 4, 2011. (*Id.*) She was represented by Attorney Adam Braverman. (*Id.*)

Hecht issued a decision on December 6, 2011, finding that Ackerman was not entitled to child's

disability benefits. (*Id.*) Ackerman requested review by the Social Security Appeals Council

("the Council") on February 7, 2012. (*Id.* at 2.) On July 18, 2013, the Council denied

Ackerman's request for review, and the ALJ's decision become the Commissioner's final

decision. (*Id.*) Ackerman filed this action on September 20, 2013. (Compl. at 3.) The Parties

consented to the jurisdiction of the undersigned on June 17, 2014. (Doc. No. 13)

## B. The ALJ Hearing

### 1. Ackerman's Testimony

#### a. Work History and Day-to-Day Routine

Ackerman was born on March 11, 1968. (Tr. at 42.) At the time of the hearing, she had

lived alone at 222 West 23rd St, NY, NY for eleven years. (*Id.*) Prior to living at that address,

she lived "at home" in Chicago. (*Id.* at 43.) Ackerman graduated from high school at seventeen.

(*Id.*) She was homeschooled for the last three years of high school. (*Id.* at 45.) This

homeschooling was necessitated by Ackerman's repeated hospitalizations for anorexia. (*Id.*) At

twenty-five, Ackerman began college. (*Id.* at 46.) She completed "some college" at an art school

but did not receive a degree. (*Id.* at 43-44.)

During the seven-year gap between high school and college, Ackerman's only

employment was a six-month job "cold calling" on behalf of the Salvation Army which allowed

her to work from home. (Tr. at 46.) She left that job because it "became too much" and because

she was overwhelmed by her eating disorder. (*Id.* at 67.) Ackerman was financially supported by

2

her parents during this time. (*Id.* at 54.) Her daily routine consisted mainly of "eating and throwing up or sleeping." (*Id.* at 52.) She did photography as a hobby, but did not get out of the house or socialize often. (*Id.* at 54.)

At twenty-five or twenty-six, Ackerman began taking courses at Northwestern University in Evanston, Illinois. (Tr. at 55.) The university was about fifteen miles from home and her parents drove her to and from classes. (*Id.* at 56.) Ackerman was able to pass most of her classes despite "always" having difficulty concentrating on the material. (*Id.*) Ackerman transferred to Columbia College in downtown Chicago, and took classes part-time. (*Id.*)

Ackerman moved to New York City at thirty-two. (Tr. at 58.) She started volunteering at a theater company and taking classes there. (*Id.* at 59.) Her work for the theater company involved volunteering as an usher, stuffing envelopes, and doing mailings. (*Id.*) She went to the theater company a "couple" of times a week, for three to four hours at a time. (*Id.* at 69.) Ackerman was compensated for her work by being allowed to see plays for free. (*Id.* at 59.) She found it difficult to stay awake to do the work, and would not take acting classes regularly. (*Id.* at 59-60.)  She stopped working for the theater company approximately four years prior to the ALJ hearing because the job was "too overwhelming" and "very tiring." (*Id.* at 64.) Ackerman acted in a few productions but never got paid. (*Id.* at 60.) She did not support herself in New York, except for occasional work as a freelance photographer. (*Id.* at 64.)

Ackerman was not proficient at cleaning and she did not cook often though she could shop for herself. (Tr. at 64.) She attended a dance class between one and three times a week that lasted two hours, but found the classes too difficult to complete without taking rest breaks. (*Id.* at 65.) Ackerman finds it difficult to read and to concentrate on what she is reading, a problem that has gotten progressively worse over the past few years. (*Id.* at 65.)

### b. Ackerman's Medical History

Ackerman was first given a psychological examination at age eleven. (Tr. at 69.) She was treated by a psychologist for anorexia from ages fifteen to twenty-two or twenty-three. *(Id.* at 48.) She was also hospitalized on multiple occasions because of her eating disorder, and was treated by different doctors *(Id.*) The doctors prescribed psychological medications, but she did not want to take them. *(Id.*)

Although not diagnosed or medicated until she was an adult, Ackerman testified that she showed symptoms of attention deficit disorder[1] ("ADD") and Tourette Syndrome[2] ("TS") when she was a child, including "foot stamping [sic], neck twitching and eye blinking." *(Id.* at 50-1.)

After moving to New York City as an adult, Ackerman continued to experience symptoms associated with having an eating disorder for five years, but those symptoms had subsided at the time of the hearing. (Tr. at 61.) While living in New York, she received psychological treatment from Dr. Mark Dollar. *(Id.*)  After approximately one year, Ackerman stopped seeing Dr. Dollar because she believed that he could not help her, and started receiving psychological care from Dr. Steven Quentzel. *(Id.* at 61.) At about this time, Ackerman was diagnosed with TS and attention deficit hyperactivity disorder ("ADHD"), though Ackerman did not testify about a specific date of diagnosis, or identify who made the diagnosis. *(Id.* at 50.)

---

[1] Attention Deficit Hyperactivity Disorder is a common childhood disorder that can continue through adolescence and adulthood. Symptoms include difficulty staying focused and paying attention, difficulty controlling behavior, and hyperactivity. *What is Attention Deficit Hyperactivity Disorder (ADHD, ADD)?*, NAT'L INST. MENTAL HEALTH, http://www.nimh.nih.gov/health/topics/attention-deficit-hyperactivity-disorder-adhd/index.shtml#part1 (last visited Jan. 21, 2015).

[2] "Tourette Syndrome is a neurological disorder characterized by repetitive, stereotyped, involuntary movements and vocalizations called tics." *Tourette Syndrome Fact Sheet,* NAT'L INST. OF NEUROLOGICAL DISORDERS AND STROKE (Apr. 16, 2014), http://www.ninds.nih.gov/disorders/tourette/detail_tourette.htm

At the time of the hearing, Ackerman was still meeting with Dr. Quentzel every four to six weeks. (Tr. at 62.) She had been prescribed Abilify, Pristiq, and Provigil, (*Id.* at 63.), but only Abilify proved effective, as it partially alleviated her tics, a symptom of TS. (*Id.*)

### 2. Medical Evidence

#### a. Dr. Stephan Quentzel ("Quentzel")

Dr. Stephan Quentzel was Ackerman's treating psychiatrist from March 2008 through March 2011 (Tr. at 318.) He met with Ackerman approximately every six weeks. (*Id.*) In a Residual Functioning Capacity Questionnaire ("RFC Questionnaire"), completed on March 9, 2011, (*Id.*) he diagnosed Ackerman with severe ADHD, generalized anxiety disorder,[3] dysthemic disorder,[4] TS, bulimia, and obsessive compulsive disorder. (Tr. at 318.) He listed her symptoms as "anxiety, depression, scattered focus, disorganization, tics, binge eating, overwhelmed, grossly inefficient, apathy and lethargy, poor stress tolerance, detached emotionally, erratic sleep, fragile, and dysfunctional." (*Id.*)

Dr. Quentzel noted that his TS diagnosis was confirmed by neurological testing conducted by Dr. J. Patrick Stubgen of Cornell University New York Hospital on August 15, 2006. (Tr. at 319.) He also provided the results of a Mental Status Examination in the RFC Questionnaire. (*Id.*)

---

[3] Generalized anxiety disorder ("GAD") causes people suffering from the disorder to be extremely worried about things such as money, health or family problems "even when there is little or no reason to worry about them." The disorder causes people to be "very anxious" about simply getting through the day, and can prevent people from doing everyday tasks. *What is Generalized Anxiety Disorder?*, NAT'L INST. MENTAL HEALTH, http://www.nimh.nih.gov/health/topics/generalized-anxiety-disorder-gad/index.shtml (last visited Jan. 21, 2015).
[4] Dysthymic disorder, also known as Dysthymia, is a chronic form of mild depression with symptoms that last for at least two years, and often last much longer. Sufferers of dysthymia can "lose interest in normal daily activities, feel hopeless, lack productivity, and have low self-esteem and an overall feeling of inadequacy." *Definition of Dysthymia,* MAYO CLINIC, http://www.mayoclinic.org/diseases-conditions/dysthymia/basics/definition/con-20033879 (last visited Jan. 21, 2015).

5

Ackerman was prescribed Savella for anxiety and depression disorders, Abilify for anxiety and tics, Adderall for ADHD, and Forteo injections for osteoporosis. (Tr. at 319.) In addition, Dr. Quentzel provided Ackerman with psychotherapy for motivation and self-help that gave her "some guidance and support." (*Id.*) Ackerman also received psychodynamic psychotherapy[5] with an outside psychologist which achieved "limited success." (*Id.*)

Dr. Quentzel determined that Ackerman's prognosis was "poor," and that she would "remain functionally anxious with come and go depression and terrible executive function." (Tr. at 320.) He also determined that it was unlikely that treatment would be successful "given all the failures to date," and that it was likely that "she would remain highly dysfunctional and thus in need of disability coverage." (*Id.*)

Dr. Quentzel reported that Ackerman had "moderate limitations" with respect to the activities of daily living: she "can care for own food, cleaning, hygiene, etc, but procrastination and disorganization allow for little self-help beyond basic survival skills/abilities." (Tr. at 320.) He further reported that Ackerman had "marked difficulties" with social functioning, (Tr. at 320.), and that her "anxiety, depression, scattered thinking and communications and visible tics" allowed her to function socially at only the most basic level and made long-term relationships virtually impossible. (*Id.*)

Dr. Quentzel also reported that Ackerman "consistently experienced" deficiencies of concentration. (Tr. at 321.) As a result, complex tasks such as functioning at a job, would be unsustainable. (*Id.*) Dr. Quentzel reported that Ackerman experienced episodes of decompensation on three or more occasions. (*Id.*) These episodes included "depressive

---

[5] Psychodynamic therapy is a form of therapy that "helps people gain greater self-awareness and understanding about their own actions" by helping "patients identify and explore how their nonconscious emotions and motivations can influence their behavior." *Psychotherapies*, NAT'L INST. MENTAL HEALTH, http://www.nimh.nih.gov/health/topics/psychotherapies/index.shtml (last visited Jan. 21, 2015).

decompensations, episodes of worsened attention and organization leading to decompensation,"
and "anxiety exacerbations resulting in paralyzing episodes." (*Id.*)

Dr. Quentzel stated that Ackerman was "grossly unable to function independently outside
of the home due only to anxiety disorders." (Tr. at 322.) When combined with the disabling
aspects of Ackerman's other disorders, he concluded that she was "completely unable to function
adequately" and that she couldn't sustain herself. (*Id.*) Although Dr. Quentzel conceded that
Ackerman had only a moderate limitation in her ability to perform simple tasks in a full-time
work setting, he stated that "she can manage simple tasks only, but even that is challenging so
[she] will be problematically slow and inefficient in performing even such simple work." (Tr. at
323.)

Dr. Quentzel completed a medical questionnaire to support Ackerman's claim of
disability on October 15, 2010. (Tr. at 228.) In the questionnaire, he stated that treatment would
never be effective, that the duration of Ackerman's condition was her "entire life" and that her
prognosis was "terrible." (*Id.* at 230.) In describing her treatment history, Dr. Quentzel listed
twenty-one different prescription medications that Ackerman had taken between 2006 and 2010.
(*Id.* at 231.) Some of the medications had limited success in addressing some of her symptoms,
but none were completely successful. (*Id.*)

Dr. Quentzel described Ackerman's daily activities as being marked by "grossly low
productivity." (Tr. at 233.) He noted that she rarely got out of bed before mid-morning and rarely
left the house before mid-afternoon. (*Id.*) He also mentioned that Ackerman's home was a "gross
mess," that she had limited hygiene, that her shopping was grossly inefficient, and that she was
unable to make anything but the simplest food. (*Id.*)

7

Dr. Quentzel also stated that Ackerman's "workplace inattention and anxiety are so problematic that work productivity continuously fails to meet minimum expectations/standards." (Tr. at 233.) He concluded that Ackerman was "an easy case for disability benefits" because she had a "gross inability" to help herself resulting from multiple diagnoses. (*Id.* at 233-34.)

In addition to completing the RFC questionnaire and the medical questionnaire, Dr. Quentzel provided twenty-four pages of treatment notes. (Tr. at 279-303.) Taken as a whole, the treatment notes reflect a constantly changing treatment regimen that never addressed all of Ackerman's symptoms. (*Id.*) As one symptom would recede, another would grow more severe, or the side effects of medication prescribed for one symptom would exacerbate or create another. (*Id.*)

### b. Evan Michaels, LCSW

Evan Michaels, LCSW, provided Ackerman with weekly psychotherapy from March 2008 through March 2010. (Tr. at 304.) In the intake memorandum he prepared about Ackerman, she reported suffering bulimia that "lasted well into her 20's," ADHD, OCD and Generalized Anxiety Disorder. (*Id.* at 307.) Michaels also reported that Ackerman claimed she had symptoms of TS as far back as she could remember, and he observed symptoms of TS during the intake interview, including visual tics. (*Id.* at 306.)

In a progress report dated October 1, 2008, Michaels noted that "progress with her has come in stops and starts" and that "it is difficult to determine whether she has experienced marked improvements in her goals." (Tr. at 309.) On April 1, 2008, Michaels reported that, although initially Ackerman seemed not to be making any progress, her use of Abilify helped with her TS and her ADHD. (*Id.* at 310.)

An October 6, 2009 report noted a lack of progress since the previous report. (Tr. at 311.) It indicated that Ackerman had become increasingly anxious and easily overwhelmed by large and small tasks. (*Id.*) The report also noted that Ackerman has "barely been able to complete anything" and seemed "unmotivated and lacking in energy." (*Id.*) The April 6, 2010 report also showed a lack of progress. (Tr. at 312.) Ackerman showed a lack of motivation and energy, and continued to be overwhelmed by both simple and large tasks. (*Id.*) This last report indicated that while Abilify had a positive effect on reducing Ackerman's tics, it was also the likely cause of her lack of energy. (*Id.*)

### c. Pamela Hops, M.D.

Dr. Pamela Hops met with Ackerman on four occasions between 2007 and 2010.[7] (Tr. at 243-256.) On her first visit, Ackerman claimed that she "almost died" from an eating disorder when she was a teenager, but "got rid of it" three to four years prior to the visit. (*Id.* at 252.) Dr. Hops diagnosed Ackerman as still having "eating disorder issues," poor insight and poor self-esteem. (*Id.* at 255.) Specifically, she indicated that Ackerman had "Disorder Tourette," Obsessive-Compulsive Disorder,[9] Attention Deficit Disorder, Abdominal Bloating, and Temporomadibular Joint Disorder. (*Id.*) Dr. Hops completed a mental status exam in which she determined that Ackerman was oriented to time, place and person, and had an intact memory, but that her judgment and insight were poor, and her mood and affect were anxious. (*Id.*)

---

[7] Ackerman visited Dr. Hops for treatment on March 14, 2007, September 11, 2007, February 12, 2010, and March 3, 2010. (Tr. at 243-256.) Dr. Hops's hospital reported that Ackerman became an outpatient on January 1, 2007, but there are no treatment notes from the hospital prior to March 14, 2007. (*Id.*)

[9] People suffering from Obsessive-Compulsive Disorder ("OCD") "feel the need to check things repeatedly, or have certain thoughts or perform routines or rituals over and over." These compulsions gets in the way of daily life, and can cause distress in those who experience them. *Obsessive-Compulsive Disorder, OCD*, NAT'L INST. MENTAL HEALTH, http://www.nimh.nih.gov/health/topics/obsessive-compulsive-disorder-ocd/index.shtml (last visited Jan. 21, 2015).

Ackerman visited Dr. Hops again on September 11, 2007, complaining mainly of a fever and a rash. (Tr. at 250.) A mental status exam indicated that Ackerman's judgment and insight were "intact" and that she exhibited no depression, anxiety or agitation. (*Id.*)

Ackerman visited Dr. Hops on February 12, 2010 because she was experiencing pain in both of her shoulders, and was unable to lift her arms above her head. (Tr. at 248.) Ackerman reported that she was "eating too much" and "getting fat." (*Id.*) Contrary to Ackerman's self-assessment, Dr. Hops described her as a "very thin female." (*Id.*) In addition to referring Ackerman to a specialist, Dr. Hops "encouraged [Ackerman] to eat more and take calcium supplements on top of her vitamin D supplements." (*Id.* at 249.)  She believed Ackerman was "malnourished/anorexic" (*Id.*)

Ackerman returned to Dr. Hops on March 3, 2010, for a complete physical examination. (Tr. at 244.) She denied suffering from depression, anxiety, memory loss, mental disturbance, suicidal ideation, hallucinations or paranoia. (*Id.*) She also denied suffering from anorexia or weight loss, though she refused to be weighed. (*Id.*) Her mental status was recorded as being normal. (*Id.* at 246.)

### d. Carol Laderman, M.D.

Dr. Carol Laderman treated Ackerman as an outpatient sporadically over a thirteen year period, meeting with her on six occasions,[10] (Tr. at 332.), each time for an eating disorder. (Tr. at 186.) Although Dr. Laderman did not provide contemporaneous treatment notes, she supplied a letter in which she indicated that Ackerman had "an extremely severe eating disorder (anorexia nervosa/bulimia) with complications including profound weight loss and dehydration." (*Id.*) Dr.

---

[10] Ackerman visited Dr. Laderman for treatment on September 19, 1988, July 27, 1989, March 23, 1994, February 19, 1996, May 2, 2001, and April 3, 2002. (Tr. at 332.)

Laderman also stated that this condition "affected her ability to function in general" because it caused her to be fatigued, fragile and weak. (*Id.*)

Dr. Laderman also provided a Disabled Dependent Certification Form, in which she stated that Ackerman had a "chronic eating disorder" that limited her ability to "function normally and hold down even a part time job." (Tr. at 216.) Dr. Laderman noted on the form that Ackerman was well known to her, though she had not treated her in four years. (*Id.*)

### c. Other treatments

Ackerman met with Wilson McDermet, Ph.D., from September 2005 through October 2006 for individual psychotherapy, and was diagnosed with anxiety disorder. (Tr. at 193.) Ackerman also received individual psychotherapy from Dr. Patricia Hunter on two occasions in 2005. (*Id.*) Dr. Hunter diagnosed her with dysthymic disorder and generalized anxiety disorder. (*Id.*) In 2006, Ackerman met with Dr. Mark Dollar from January through November for "medication management." (*Id.* at 193.) Dr. Dollar sent Ackerman to Dr. Patrick Stubgen at New York Presbyterian Hospital for a neurologic assessment in August 2006. (*Id.* at 236.) Dr. Stubgen determined that Ackerman's history and examination were consistent with TS, and prescribed medication to help control her symptoms. (*Id.*) In June and July 2007, Ackerman met with Dr. Jeffery Newcorn, a psychiatrist at Mt. Sinai School of Medicine, who diagnosed her with TS. (*Id.* at 193.) On September 17, 2007, Ackerman was assessed by Tina Zarrillo, LCSW, at St. Vincent's Hospital. (*Id.* at 218.) Ackerman's mental status examination at this time reported an anxious mood, full range affect, good insight and fair judgment. (*Id.* at 221.) She was diagnosed with generalized anxiety disorder and TS. (*Id.*) In addition, Ackerman was assessed as possibly having ADHD and OCD. (*Id.*)

### f. Medical Consultation

A medical consultant, R. Nobel ("Nobel"), reviewed the records dated March 11, 1986,

through March 11, 1990, and completed a "psychiatric review technique." (Tr. at 257.) The

review was undertaken at the request of C. Slavik, an SSA analyst. (*Id.* at 275.)  In the request,

Slavik wrote that he believed that there was sufficient documentation to reasonably conclude that

Ackerman had a chronic condition that "at no time has gotten better." (*Id.*)  Nobel concluded that

there was insufficient evidence to come to a medical disposition. (*Id.* at 257.)  Specifically,

Nobel wrote that anorexia during Ackerman's teenage years can be established as well as a

medical-vocational allowance after March 20, 2008, (*Id.* at 275.), the date Ackerman starting

seeing Dr. Quentzel for treatment. (*Id.*) Finally, Nobel concluded that there was insufficient

evidence to determine whether Ackerman was markedly impaired at any point because

symptoms of ADHD, GAD and EDs tend to fluctuate over time. (*Id.*)

### 3. The ALJ's Findings

On December 6, 2011, ALJ Mark Hecht issued a decision stating that Ackerman was not

disabled under 20 C.F.R. §§ 404.350(a) and 404.1520(g), which require Ackerman to have been

disabled from August 18, 2010, (the date she filed for disability benefits) with a disability that

began prior to March 10, 1990 (the date she attained age twenty-two). (Tr. at 22.)

In the first step of the analysis, the ALJ concluded that Ackerman had never engaged in

Substantial Gainful Activity ("SGA"). At step two of the analysis, the ALJ found that prior to

age twenty-two, Ackerman had the severe impairments of "anorexia nervosa/bulimia" and TS.

(Tr. at 14.) The ALJ also determined that since the date of the application, Ackerman had TS,

ADHD, GAD, dysthymic disorder, OCD, and a history of anorexia nervosa/bulimia. (*Id.*) The

ALJ determined that those impairments, either individually or in combination, caused more than

a minimal limitation in Ackerman's ability to perform basic work activities, and were therefore considered "severe." (*Id.*)

At step three of the analysis, the ALJ determined that Ackerman did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. (Tr. at 15.) The ALJ found that Ackerman had only a mild restriction on the activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and had not experienced any documented episodes of decompensation of extended duration during the period at issue. (*Id.*)

In step four of the analysis, the ALJ determined that Ackerman has the residual functioning capacity ("RFC") to perform light exertional work limited to simple, repetitive tasks. (Tr. at 16.) He found that neither Ackerman's testimony about the intensity of her symptoms nor the evidence or assessments submitted by Dr. Quentzel, Dr. Laderman or Mr. Michaels, to the extent that they were not consistent with the ALJ's residual functioning capacity assessment, was credible. (*Id.* at 20-21.)

The ALJ concluded that although Ackerman did have a severe eating disorder as a teenager, it had been resolved at the time the application was filed. (Tr. at 20.) He found that while Ackerman manifested symptoms of TS prior to age twenty-two, the symptoms were under control with medication. (*Id.*) Similarly, the ALJ determined that Ackerman's ADHD was under control with medication, and that she was able to engage in a wide variety of activities despite the ADHD, including college level classes. (*Id.*) The ALJ dismissed Ackerman's other conditions, including OCD, depression and anxiety disorder, by highlighting that they did not prevent her from living independently and engaging in various activities. (*Id.*)

13

The ALJ determined that because Ackerman's eating disorder did not overlap with her current impairments, and because her current impairments were either under control with medication or not so limiting as to restrict her daily activities, Ackerman was not, at the time the claim was filed, or the time the decision was rendered, under a disability that began before the age of twenty-two. (Tr. at 21.) He also determined that she could perform light exertional work. (*Id.*)

In the fifth and final step of his analysis, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Ackerman can perform. (Tr. at 22.)

## C. Appeals Council Review

Ackerman requested review of the ALJ's decision by the Appeals Council on February 7, 2012. (Tr. at 7.) She submitted additional evidence, including a letter from Dr. Quentzel dated February 27, 2012. (*Id.*) Because Dr. Quentzel's letter contained new information that was about a period of time after the ALJ decided the case on December 6, 2011, the Appeals Council determined that the new information did not affect the decision about whether Ackerman was disabled on or before December 11, 2011. (*Id.*) The Appeals Council denied Ackerman's request for review on July 18, 2013, thus making the ALJ's decision the Commissioner's final decision. (Tr. at 6.)

## III. DISCUSSION

### A. Standard of Review

Judicial review is limited to determining whether the Commissioner applied the correct legal principles in making a decision and, if so, whether the decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Arnone v. Bowen,* 882 F.2d 34, 37 (2d Cir. 1989); *Johnson v. Bowen,* 817 F.2d 983, 985; *Mimms v. Heckler,* 750 F.2d 180, 185 (2d Cir. 1984);

*Richarsdon v. Perales,* U.S. 389, 401 (1971). Therefore, the reviewing court does not review *de novo* whether a claimant is disabled. *Pratts v. Charter,* 94 F.3d 34, 27 (2d Cir. 1996); *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir. 1991).

An ALJ's failure to apply the correct legal standard constitutes reversible error when the failure may have "affected the disposition of the case." *Pollard v. Halter,* 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler,* 748 F.2d 109, 112 (2d Cir. 1984). In such a case, the court may remand the matter to the Commissioner under 42 U.S.C. § 405(g), if it is deemed necessary to allow the ALJ to develop a full and fair record to explain his reasoning. *Crysler v. Astrue,* 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008) (citing *Atartone v. Aplel,* 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)). If the reviewing court finds that the ALJ applied the correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault v. Social Security Administration Commissioner,* 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir. 2009)).

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla." *Richardson,* 402 U.S. At 401 (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). The substantial evidence standard applies to findings of fact as well as inferences and conclusions drawn from such facts. *Marrero v. Apfel,* 87 F. Supp. 2d 340, 345 (S.D.N.Y. 2000); *Smith v. Shalala,* 856 F. Supp. 118, 121 (E.D.N.Y. 1994).

If the Commissioner's decision that a claimant is not disabled is supported by substantial evidence in the record, the Court must uphold the decision. 42 U.S.C. § 405(g); *Jones,* 949 F.2d at 59; *Arnone,* at 882 F.3d 34. The Court must uphold a denial of benefits supported by

substantial evidence even where substantial evidence may also support the plaintiff's position, *Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir. 1990), or where a reviewing court's independent conclusion based on the evidence may differ from the Commissioner's. *Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir. 1982), *cert denied,* 459 U.S. § 1212(193); *Schauer v. Schweiker,* 675 F.2d 55, 57 (2d Cir. 1982). While the ALJ must set forth the essential considerations with sufficient specificity to enable the reviewing court to determine whether the decision is supported by substantial evidence, he need not "explicitly reconcile every conflicting shred of medical testimony." *Mongeur v. Heckler,* 722 F.2d 1033, 1040 (2d Cir. 1983) (citing *Miles v. Harris,* 645 F.2d 122, 124 (2d Cir. 1981)). A reviewing court gives deference to the ALJ's evaluation since he observed the claimant's demeanor and heard the testimony first-hand. *Pena v. Chater,* 968 F. Supp. 930, 938 (S.D.N.Y. 1997), *aff'd sub nom. Pena v. Apfel,* 141 F.3d 1152 (2d Cir. 1998) (citing *Mejias v. Social Security Administration,* 445 F. Supp. 741, 744 (S.D.N.Y. 1978)).

## B. Determination of Disability

### 1. Evaluation of Disability Claims

Under the Social Security Act, each person who is considered to be "disabled" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act's definition of disability for the purposes of disability insurance is substantially similar to that applicable to social security insurance. *Hankerson v. Harris,* 636 F.2d 893, 895 (2d Cir. 1980). A person is considered disabled when he or she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A); *Beauvoir v. Chater,* 104 F.3d 1432, 1433 (2d Cir. 1997). Establishing the mere

presence of an impairment is not sufficient for a finding of disability; the impairment must cause severe functional limitations that prevent a claimant from engaging in any substantial gainful activity. 42 U.S.C. § 432(d)(2); *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir. 1999). If a claimant is able to engage in his previous work or other substantial gainful work, regardless of whether such work exists in the immediate area where he lives, whether a vacancy exists, or whether he would be hired for such work, he will not be found disabled under the Act. *See* 42 U.S.C. §§ 423(d)(2)(A), and 1382c(a)(3)(B). For the individual to be found disabled, both the medical condition and the inability to engage in gainful activity must last for at least twelve months. *See Barnhart v. Walton,* 535 U.S. 212, 217–22, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002).

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step sequential analysis: (1) determine whether the claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the claimant has a "severe impairment" that significantly limits his ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the regulations; if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the RFC to perform his past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520; *Rosa,* 168 F.3d at 77; *Gonzalez v. Apfel,* 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999).

The Commissioner must assess the claimant's RFC to apply the fourth and fifth steps of the inquiry. A claimant's RFC represents the most that claimant can do despite his limitations. 20 C.F.R. § 416.945(a). The Commissioner must consider objective medical facts, diagnoses and medical opinions based on such facts, subjective evidence of claimant's symptoms, as well as

claimant's age, education, and work history. *Echevarria v. Apfel,* 46 F. Supp. 2d 282, 291

(S.D.N.Y. 1999); *Mongeur,* 722 F.2d at 1037 (citing *Miles v. Harris,* 645 F.2d 122, 124 (2d Cir.

1981)); 20 C.F.R. § 404.1526(b). To properly evaluate a claimant's RFC, the ALJ must assess

the claimant's exertional capabilities, addressing his ability to sit, stand, walk, lift, carry, push,

and pull. 20 C.F.R. §§ 404.1545(b), 404.1569(a). The ALJ is also required to evaluate the

claimant's nonexertional limitations, including depression, nervousness, and anxiety. 20 C.F.R.

§§ 404.1545(b), 404.1569(a).

The claimant bears the burden as to the first four steps of the five-step analysis, while the

Commissioner has the burden of proving the fifth step. *Berry v. Schweiker,* 675 F.2d 464, 467

(2d Cir. 1982). A claimant's own testimony regarding his daily activities often supports a finding

that the claimant is capable of performing gainful activity. *See Pena,* 968 F. Supp. at 938. If the

claimant can establish that his severe impairment prevents him from returning to his previous

work, the burden shifts to the Commissioner to demonstrate that the claimant retains the RFC to

perform alternative substantial gainful activity which exists in the national economy. *Gonzalez,*

61 F. Supp. 2d at 29.

In addition, the Commissioner considers the claimant's statements regarding pain and

other symptoms, but this alone will not establish disability. 20 C.F.R. § 404.1529(a). Medical

findings must support the conclusion that the claimant suffers from an impairment which could

"reasonably be expected to produce the pain or other symptoms alleged by the claimant, and

which, when considered with all other evidence, would lead to the conclusion that the individual

is under a disability." *See* 20 C.F.R. §§ 404.1529, 416.929. If the claimant's symptoms suggest a

greater impairment than can be shown by objective evidence alone, other factors should be

considered. *Echevarria,* 46 F. Supp. 2d at 292. These factors can include: (1) the person's daily

activities; (2) the location, duration, frequency, and intensity of pain and other symptoms; (3)

precipitating and aggravating factors; (4) type, dosage, effectiveness, and adverse side effects of

medication taken by the individual to alleviate pain or symptoms; (5) treatment, other than

medication used to relieve pain; and (6) any other measures that the person uses or has used to

relieve the pain or symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The ALJ may reject

claims of severe and disabling pain after weighing medical evidence in the record, the claimant's

demeanor, and other indicia of credibility. *See* Soc. Sec. Rul. 96–7p, 61 Fed.Reg. 34, 483 (1996),

1996 WL 374186 (S.S.A); *Aponte v. Secretary, Department of Health and Human Services,* 728

F.2d 588, 591–92 (2d Cir. 1984). However, the ALJ must give reasons "with sufficient

specificity to enable [a court] to decide whether the determination is supported by substantial

evidence." *Echevarria,* 46 F. Supp. 2d at 292; *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.

1984); *see Lugo v. Apfel,* 20 F. Supp. 2d 662, 663–4 (S.D.N.Y. 1998).

Adult child disability benefits are available "if such child was under a disability (as so

defined) at the time she attained the age of 18 or if she was not under such a disability (as so

defined) at or prior to the time she attained (or would attain) the age of 22." 42 U.S.C. §

402(d)(1)(Gb); *see also* 20 C.F.R. § 404.350(a)(5). *Veila v. Astrue*, 634 F. Supp. 2d 410, 417

(S.D.N.Y. 2009).

.

19

Social Security regulations set forth a process for determining whether a child is eligible for benefits:

> The regulations establish a three-step process. First, the child must not be engaged in "substantial gainful activity." [20 C.F.R.] § 416.924(a). Second, the child "must have a medically determinable impairment(s)" that is "severe" in that it causes more than minimal functional limitations." *Id.* § 416.924(c). Third, the child's impairments or combination of impairments must medically or functionally equal an impairment listed in an appendix to the regulations. *See id.* § 416.924(d); 20 C.F.R. pt. 404, subpt. P. app. 1 (listing and describing impairments).

*Encarnacion v. Astrue* 568 F.3d 72, 75 (2d Cir. 2009).

### 2. The Treating Physician Rule

The opinion of a claimant's treating physician is generally given more weight than the opinion of a consultative physician because the treating physician is likely "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Burgess v. Astrue,* 537 F.3d 117, 128 (2d Cir. 2008) (discussing the "treating physician rule of deference"). The treating physician rule "is even more relevant in the context of mental disabilities, which by their nature are best diagnosed over time." *Santiago v. Barnhart,* 441 F. Supp. 2d 620, 629 (S.D.N.Y. 2006). A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must attempt to fill any clear gaps in the administrative record, *Burgess,* 537 F.3d at 139, especially where the claimant's hearing testimony suggests that the ALJ is missing records from a treating physician. The lack of specific clinical findings in a treating physician's report is not, on its own, enough to justify an ALJ not crediting the opinion of a treating physician. *Schaal*, 134 F.3d at 505. ("Even if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating

20

physician] *sua sponte.*")

Second, the ALJ must give advance notice to a *pro se* claimant of adverse findings. *Snyder v. Barnhart,* 323 F. Supp. 2d 542, 545 (S.D.N.Y. 2004) (citing *Infante v. Apfel,* No. 97 Civ. 7689(LMM), 2001 WL 536930, at *6 (S.D.N.Y. May 21, 2001)). This allows the pro se claimant to "produce additional medical evidence or call [her] treating physician as a witness." *Brown v. Barnhard,* No. 02 Civ. 4523(SHS), 2003 WL 1888727, at *7 (S.D.N.Y. Apr. 15, 2003) (citing *Santiago v. Schweiker,* 548 F. Supp. 481, 486 (S.D.N.Y. 1981)).

Third, the ALJ must explicitly consider various "factors" to determine how much weight to give to the opinion of a treating physician. *Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2)). These factors include: (1) the length, nature, and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2) (i-ii) & (c) (3–6).

Fourth, the ALJ is required to explain the weight ultimately given to the opinion of a treating physician. *See* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir. 1998); *see also Halloran,* 362 F.3d at 32 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). Reasons that are conclusory fail the "good

reasons" requirement. *Gunter v. Comm'r of Soc. Sec.,* 361 Fed. Appx. 197, 199 (2d Cir. 2010) (finding reversible error where an ALJ failed to explain his determination not to credit the treating physician's opinion). The ALJ is not permitted to arbitrarily substitute his own judgment of the medical proof for the treating physician's opinion. *Balsamo,* 142 F.3d at 81.

### 3. The ALJ Did Not Properly Review and Evaluate the Evidence, and did not Apply the Correct Legal Principals

#### a. The ALJ Violated the Treating Physician Rule

(1) The ALJ failed to fill a clear gap in the administrative record.

An ALJ is required to seek additional information from a treating physician *sua sponte* if the provided clinical findings are inadequate. *Schaal,* 134 F.3d at 505. In making the determination in this case, ALJ Hecht asserted that Dr. Quentzel did not provide objective clinical findings to support his assessment. (Tr. at 19.) This is not accurate. Dr. Quentzel included a mental status examination ("MSE") in the medical questionnaire that he provided to the Social Security Administration. (*Id.* at 232.) The MSE provided by Dr. Quentzel is identical in form to the MSE provided by Dr. Hops that the ALJ relies on.

Dr. Quentzel also provided treatments notes that contained his clinical findings. 20 C.F.R. § 404.1513(b)(2). These notes described Ackerman's psychological state and mental status, (Tr. at 286, 292, 298, 300, 330.), and can be substituted for a mental state examination. *See Canales,* 698 F. Supp. 2d at 343.

In addition, ALJ Hecht determined that there was no overlap between Ackerman's current conditions and her history of eating disorders. (Tr. at 20.) The record is not clear, but it is possible that Dr. Hops diagnosed Ackerman with anorexia and bulimia in 2010, well after she started receiving treatment for her other conditions, including TS, anxiety or ADHD. (Tr. at

249.) Nothing in the record indicates that ALJ Hecht made an effort to clarify the meaning of Dr. Hops's treatment notes.

The ALJ was required to fill clear gaps in the administrative record. The record does not reflect that the ALJ attempted to do so. This was error.

> (2) The ALJ did not properly apply the five factor test in determining how much weight to give to the opinions of Ackerman's treating physicians.

The ALJ misapplied the five factor test set forth in *Holloran,* 362 F.3d at 32. The first factor, regarding the length, nature and extent of the treatment relationship did not support the ALJ's conclusion. The ALJ disregarded the conclusions of Dr. Quentzel and Mr. Michaels and relied on the treatment notes provided by Dr. Hops. Dr. Quentzel and Mr. Michaels saw Ackerman regularly for years while Dr. Hops treated her on four occasions. Moreover, Dr. Quentzel and Mr. Michaels were treating Ackerman for various psychological issues, while Dr. Hops was treating her as an orthopedist and a general practitioner. Not surprisingly, Dr. Hops made fewer psychological findings then Dr. Quentzel or Mr. Michaels.

The second factor, the evidence supporting the treating physician's opinion, also supports giving more, not less, weight to Dr. Quentzel's opinion. Dr. Quentzel provided a mental status examination and completed a medical questionnaire and an RFC form. He also provided twenty-four pages of contemporaneous treating notes to support his conclusions. The ALJ's conclusion that Dr. Quentzel's assessment was not supported by objective clinical findings is therefore without merit. The ALJ also noted that Ackerman never tested positive for hallucinations, delusions or paranoia. (Tr. at 19.) He did not indicate how or why this would have some impact on Dr. Quentzel's assessment or why the absence of these specific symptoms affected his determination of Ackerman's disability status.

In applying the third factor, whether the treating physician's opinion is supported by the record as a whole, the ALJ concluded that Dr. Quentzel's assessment was not. The ALJ's conclusion was erroneous. He found that Ackerman's daily activities were inconsistent with Dr. Quentzel's assessment. (Tr. at 20.) He stated, for example, that Ackerman "worked at a theater company for several years in exchange for taking classes." This statement mischaracterizes the testimony as a whole. (Tr. at 21.) Ackerman testified that she did not take the classes regularly, and she stopped going to the theater company a few years ago because it became "too much." (Tr. at 63.) Similarly, the ALJ stated that Ackerman worked as a self-employed photographer. (Tr. at 21.) Ackerman testified, however, that this was a "one time thing." (Tr. at 64.) Finally, the ALJ used the fact that Ackerman was taking a dance class to undermine Dr. Quentzel's conclusion. The ALJ disregarded that part of Ackerman's testimony where she indicated that this dance class was two hours per session, and that she could not make it through the class without taking a rest. (Tr. at 65.)

The ALJ also erred in considering the results of Dr. Hops's various mental status examinations. The ALJ focused on Dr. Hop's March 3, 2010 visit with Ackerman, highlighting that Ackerman had a normal MSE. (Tr. at 19.) He ignored Dr. Hop's notes from one month earlier, where Dr. Hops wrote that she felt that Ackerman was "malnourished/anorexic" and describes her as a "very thin" woman who thinks she is "getting fat." (*Id.* at 249.)

Although an ALJ may disregard a treating physician's opinion if it is not supported by the record, the ALJ may not simply misstate the record. In this case, the ALJ focused on select portions from the record while disregarding the whole.

Further, in crediting Dr. Hops over Dr. Quentzel, the ALJ ignores the fourth factor of the analysis. "It is unrealistic to expect that doctors who either lack the necessary qualifications to

24

perform mental examinations or are not examining a patient for such a condition would detect a patient's affective disorder while treating her for a physical ailment." *Santiago,* 441 F. Supp. 2d at 630. Both Dr. Quentzel and Mr. Michaels specialize in psychological care. The ALJ acknowledged that Dr. Hops's specialty is orthopedics, and that her "assessment of the claimant's mental status may be beyond her expertise," (Tr. at 19.), but still gave it controlling weight over Ackerman's psychological treating physicians.

### b. The ALJ erred by placing too much weight on Ackerman's daily activities.

Daily activities undertaken to care for oneself "do not by themselves contradict allegations of disability as people would not be penalized for enduring the pain of their disability in order to care for themselves." *Woodford v. Apfel*, 93 F. Supp.2d 521, 529 (S.D.N.Y. 2000) (ALJ's RFC assessment that claimant was able to do sedentary work reversed and remanded because the ALJ improperly relied on the claimant's ability to cook and shop for herself, the claimant's ability to use public transportation, and the fact that that the claimant was able to sit through a six-hour flight to Portugal while allegedly disabled). Additionally, the ability to attend college is "far different from engaging in regular work, full-time or part-time." *Chiappa v. Secretary of Dept. of Health, Ed. and Welfare*, 497 F. Supp. 356, 361 (S.D.N.Y. 1980) (Claimant claimed disability because of pain and other damage caused by a gunshot wound.)

The substantial space the ALJ dedicated to discussing Ackerman's daily activities demonstrates the undue weight that he gave to those activities when making a determination about Ackerman's RFC. The ALJ noted that Ackerman lives alone, uses public transportation, cares for a dog, does her own shopping and cleaning, and prepares simple meals. (*Id.* at 19-20.) The ALJ also noted that Ackerman graduated from high school at the age of seventeen despite her inability to attend classes. (*Id.*at 20.) The ALJ also highlighted that Ackerman did well in the

college classes she was able to complete despite having problems concentrating, went to dance class one to three times a week, rented DVDs from the library, worked on a computer and occasionally did freelance photography. (*Id.*) In addition, the ALJ noted that Ackerman took a trip in 2009, and that Ackerman's father confirmed that she did not need reminders to take medication, that she socialized, talked on the telephone, sent text messages, and that she paid some of her bills. (*Id.*)

In addition to the activities listed above, the ALJ considered the fact that Ackerman worked at a theater company in exchange for free classes or free theater tickets. (*Id.*) He mentioned that Ackerman had worked as a self-employed dog walker and a self-employed photographer. (*Id.* at 21.) Finally, the ALJ speculated that Ackerman lacked an employment history because her father provided financial support. (*Id.*) The ALJ dismissed Ackerman's ADHD as being under control with medication "because she has been able to participate in a wide range of activities, including taking college level classes and participating in some theater productions." (Tr. at 20.)

Although a claimant's ability to complete college courses is more relevant when the issue is ADHD then it is when it is debilitating pain, the ALJ's use of Ackerman's past college courses still constitutes legal error. First, as discussed in *Chiappa*, 495 F. Supp. 356, completing college courses in fine arts and maintaining full or part-time employment cannot be equated, insofar as the time and stress associated with those activities are vastly different. The same is true for Ackerman's participation in dance classes, her participation at a theater, or her very irregular freelance photography or dog walking.

Second, the ALJ erred by relying on Ackerman's day-to-day activities such as using public transportation, using basic cooking and cleaning skills and communicating with her father.

Although a claimant's daily activities can be considered as part of an RFC assessment, *Woodford*, 93 F. Supp.2d at 529, in this case the ALJ rests much of his analysis on Ackerman's activities.

### c. The ALJ erred by failing to develop the record

"The duty of the ALJ to develop the record is particularly important when it comes to obtaining information from a claimant's treating physician." *Devora v. Barnhart*, 205 F. Supp. 2d 164, 172-3 (S.D.N.Y. 2002). This obligation includes obtaining medical records and reports from claimant's treating physicians. *Id.* at 173. It is not always necessary to remand when an ALJ fails to request opinions when the record contains sufficient evidence from which an ALJ can assess the claimant's RFC. *Tankisi v. Commissioner of Social Sec.*, 521 Fed.Appx. 29, 34 (2d Cir. 2013). In *Tankisi*, the ALJ relied on "voluminous" medical records, including an assessment of the claimant's limitations from a treating physician. *Id.* at 34.

In this case, the ALJ dismissed the formal assessments provided by three of Ackerman's treating professionals, including Drs. Quentzel and Laderman, and Mr. Michaels. Nothing in the record indicates that the ALJ attempted to get RFC assessments from any of Ackerman's other doctors. Instead, the ALJ came to his determination by relying on Ackerman's daily activities and by relying on the limited treatment notes provided by Dr. Hops, Ackerman's general practitioner. The ALJ also stated that contemporaneous treating notes provided by Dr. Quentzel could not be reconciled with Quentzel's RFC assessment, but he provided no citations to specific notes. Although an ALJ should reconcile conflicting medical opinions, he cannot substitute his own judgment for that of a medical professional. In this case, the ALJ disregarded the diagnosis and assessments that were available to him, and substituted his own opinion instead.

Accordingly, the ALJ's decision that Ackerman is not eligible for disability was not determined under the correct legal standard.

## IV. CONCLUSION

For the reasons set forth above, I order that the Commissioner's motion be **DENIED** and the case **REMANDED** for further proceedings.

**SO ORDERED this 31st day of March 2015**
**New York, New York**

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**